UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JAMES CARL CRANDELL

VERSUS

LOUISIANA STATE PENITENTIARY

CIVIL ACTION NO. 10-cv-1602

JUDGE FOOTE

MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

A Bossier Parish jury found James Crandell ("Petitioner") guilty of first degree murder in 1991. The jurors could not agree unanimously to impose a death sentence, so Petitioner received a mandatory life sentence.  Co-defendant Gail Willars was convicted of second degree murder and given a life sentence. This court granted habeas relief on Petitioner's challenge of racial discrimination in the selection of grand jury foremen in Bossier Parish, where officials had not appointed an African-American grand jury foreperson despite 50 opportunities between 1965 and 1990.  Crandell v. Cain, 421 F.Supp. 2d 928 (W.D. La. 2004).

A new grand jury again indicted Petitioner for first degree murder, but the State later amended the indictment to a second degree murder charge.  Petitioner was found guilty of second degree murder and sentenced to life imprisonment.  He argued on direct appeal that the trial court should not have allowed the introduction of transcripts of testimony from the 1991 trial and, assuming the transcripts were admissible, should have better redacted them

to exclude irrelevant and prejudicial matters.  The state court affirmed the conviction.  State v. Crandell, 987 So.2d 375 (La. App. 2d Cir. 2008), writ denied, 5 So.3d 139, 140 (La. 2009), cert. denied, 130 S.Ct. 183 (2009).  Petitioner now seeks federal habeas corpus relief on the grounds presented on direct appeal.  For the reasons that follow, it is recommended the petition be denied.

**Relevant Facts**

**A. Introduction**

The facts set forth in Petitioner's memorandum appear to be a verbatim copy of the facts portion of the state appellate court's decision.  Petitioner challenges the state court's application of the law to the facts, but he apparently has no argument with the accuracy of its recitation of the evidence.  This recommendation will also rely largely on the facts as stated in the state court's opinion, confirmed by review of the record.

**B. Evidence of Unavailability of Witnesses**

The state notified the defense that it intended to introduce as evidence the transcribed testimony of Margie Theodos, Gail Willars, and Zachary Willars from the 1991 trial, each of whom was said to be unavailable as witnesses.  Ms. Theodos was deceased, Gail Willars had opted not to testify on Fifth Amendment grounds, and Zachary could not be found. Petitioner objected on the grounds that the previous trial had been vacated as an absolute nullity, Gail Willars had not persistently refused to testify, and the state had not made adequate efforts to find Zachary.

The state introduced a copy of a newspaper obituary for Margie Theodos that indicated she died on February 23, 2007. Her husband and son were also deceased. The trial court overruled Petitioner's objection that the obituary did not prove that the decedent was the same Margie Theodos who had testified at the first trial and allowed the obituary to be introduced.  The trial court also found that Petitioner's right to confront and cross-examine witnesses was not impacted by use of the prior testimony by the three unavailable witnesses and rejected the argument that the testimony could not be used because the prior conviction had been vacated.

Trial began September 25, 2007.  Outside of the jury's presence, the trial court again took up the unavailability of Theodos, Willars, and Zachary.  The state called Amy Noonan, felony supervisor for the Bossier Parish District Attorney's ("BPDA") office, to testify about efforts to find Zachary.  Noonan testified that the BPDA tried to locate Zachary, who was now an adult, about a year and a half before trial, based on information that he had been in several psychiatric hospitals in Houston, Texas.  They were unable to locate him at any of those facilities.  In June 2007, BPDA obtained a material witness warrant for Zachary's last know address at a hospital in Houston and at four other addresses, two in Houston and two in Chicago.  Upon learning that Zachary was probably in California, the BPDA made no effort to serve him at the Houston or Chicago addresses.

Noonan testified that she conducted computer searches for Zachary for "months." On September 20, 2007, just before trial began, she searched Accurint.com, Whitepages.com,

Nlets.org, and the National Crime Information Center.  She found various tenants at the addresses the BPDA had for Zachary, and she discovered the names of an aunt and uncle who lived in Springs, Texas.  Noonan contacted these relatives, who told her they last spoke to Zachary about one and a half years earlier when he was in a mental institution in California, but they had not talked to him since and did not know where he could be found. Noonan attempted to have Zachary served at an address in Coarsegold, California, without success.  A summons mailed to another possible address in Camarillo, California, was returned as undeliverable. Tr. 621-36, 641-45.  District Attorney Schuyler Marvin testified that he had recently spoken with Zachary's mother, Gail, who told him that she did not know where her son could be found. Tr. 647-48.

With regard to Ms. Theodos, Noonan testified that an Accurint search for her name returned a result with a "D," indicating that she was deceased.  Although Noonan was not able to obtain a death certificate or other proof of death through the coroner's office, a cousin of Ms. Theodos confirmed that she had died, and a copy of the obituary from the local newspaper was obtained.   Rick Foster testified that his parents lived next door to Ms. Theodos and her husband for more than 30 years, and he knew she died the past February, and her husband died about a week later. Tr. 651-55.

The trial court next addressed Gail Willars' unavailability.  Willars testified that she was continuing to contest her conviction through a petition for certiorari to the United States Supreme Court and chose to invoke her Fifth Amendment right not to testify in Petitioner's

case.  When it was pointed out that the Supreme Court indicated Willars had nothing pending, she said the Court had returned her petition with instructions to provide additional information and refile it before "the end of October."  She provided a copy of the petition to the BPDA. Tr. 658-60.

A review of this court's records lends some credence to Willars's testimony about the petition. She first challenged her conviction in a habeas petition filed in 1997.  Willars v. Warden, 97 CV 0693.  It was denied on the merits, and the Supreme Court denied certiorari in 1999.  After Petitioner obtained relief on the grand jury foreman claim, Willars filed a second habeas petition, 06 CV 1209, in an effort to raise the same issue.  This court struck the petition as second or successive and lacking authorization from the Fifth Circuit to proceed.  The Fifth Circuit, in 07-30428, denied authorization to pursue the second or successive petition.  That decision was dated July 11, 2007, so it is plausible that Willars was preparing a petition for certiorari at the time of trial in September 2007.  Westlaw does not include a denial of the petition, so perhaps it was not actually refiled.

Regarding her son Zachary's whereabouts, Willars told the court:

I believe he's somewhere in Los Angeles. [Willars said she did not know his address.] He may possibly testify, but I don't believe you would get any results from him because he is extremely mentally ill. He is, to my knowledge, living somewhere on the street. He's been in a forensic facility where he has just been released from recently and he's doing drugs and he's in pretty bad shape. He's been in and out of mental institutions for the last few years.

The court asked Willars whether she would invoke the privilege against self-incrimination if she were questioned by the state or the defense about the events of August 21, 1989 (the Parr murder), and she replied, "Yes, sir." Tr. 660-62.

The trial court ruled that all three witnesses were unavailable and that the state could use the transcripts of their prior testimony as evidence against the defendant. The transcripts could be read, with counsel asking the questions, and court law clerks answering in the role of the witnesses.  Defense counsel objected to the ruling. Tr. 664-71, 675-76.

**C. Ms. Theodos** (Tr. 696-714)

Trial resumed with the presentation of Ms. Theodos' testimony from the 1991 trial. The judge told the jury that the testimony was "from a prior proceeding" and was being read because the witness was unavailable.  Ms. Theodos testified  that Petitioner and Willars began renting a room at the Beacon Manor motel, owned by Theodos and her husband, in mid-July 1989.  They were due to be evicted for non-payment of rent at noon on August 21, 1989.  Ms. Theodos sent two maids to check on them late that morning. One maid called her on the phone to say there was a man in the room, and he appeared to be dead.  Ms. Theodos admitted the Beacon Manor rented rooms for as little as an hour at a time, supplied free condoms to its customers, and had free adult movies, but she denied problems with prostitution. At the end of Theodos' testimony, the defense objected to references in the transcript to Petitioner and Willars being "the defendants," in court, and the proceeding being called a trial.  The objection was overruled.

### D. Gail Willars (Tr. 786-967)

After additional testimony, the 1991 transcript of Gail Willars' testimony was read. Willars, in 1987, was living in Durham, Arkansas with her husband Jerry Wayne Willars and their son, Zachary.  Jerry, who was a manager of a Red Lobster restaurant, hosted a Halloween party, followed by a barbecue the next day, for employees of the restaurant and their families.  He was driving a tractor pulling a trailer for a hayride when an accident dumped everyone out of the trailer, including Gail and Zachary, and pinned Jerry beneath the tractor.  He died several days later.

Willars received $150,000 in death benefits and monthly life annuity of $2,500 from Jerry's former employer.  She also collected on credit life and other policies her husband had provided.  Petitioner, who had been an acquaintance, soon began to visit and comfort Willars, and he knew about the benefits she collected.  The couple soon began traveling together. Petitioner introduced Willars to cocaine during a trip to Georgia to scatter her husband's ashes.  She then began to supply Petitioner with money (e.g., $10,000 one time, $11,400 another) to buy them drugs, which she said took away her pain and grief.  Willars also bought Petitioner several cars.

The pair dropped Zachary in Houston with his grandmother, then traveled throughout Texas, Arkansas, and Louisiana, living in motels and using about a pound of cocaine per week at a cost of $10,000 to $15,000.  They were arrested for possession in Cass County, Texas in March 1988 after about three months of that lifestyle.  Willars bonded out, but she

was arrested again on a drug charge in Houston. She pleaded guilty, received probation, began drug treatment, and started turning around her life. That changed when Petitioner was released on parole and soon persuaded Willars and Zachary to travel again, to Michigan, Arkansas, Illinois, and finally Bossier City.

By the summer of 1989, Willars was out of money except for the monthly payments, which were sent to her father's address in Houston. Petitioner was "in violation of his parole," so the pair did not want to drive back to Houston for the checks. Willars' father cashed the checks and wired the money to her wherever she happened to be. In July 1989, their location was room 15 at the Beacon Manor. Willars testified that they had spent all the money for the month, so they sold their car for $250 to pay for the room. Willars said they were using little, if any, cocaine at this point due to lack of funds.

The couple faced eviction on Monday, August 20 after they ran out of money again. Petitioner suggested that Willars prostitute herself to obtain money for rent. Leonard, who managed some prostitutes at the hotel, and Rose, a prostitute, gave Willars training for the job. Willars was able to attract at least three potential customers over the weekend, but she backed out each time. She continued to call her father and several friends to whom she had loaned money, but she had no luck rasing funds from them.

On the Sunday morning before the day they were to be evicted, Willars tried again to call her father for money. While she was at the payphone, Charles Parr drove up to her and asked if she needed a ride and whether she was a working girl. Willars said no, and a nearby

police car caused Parr to speed away. He soon returned and, after some negotiations, Willars agreed to perform oral sex for $30. Willars said she thought Petitioner and Zachary had left the room as she instructed. She and Parr entered the room and began to disrobe. Willars testified that Parr had her turn on a movie, began to fondle himself, and hinted at a desire for more than oral sex. Willars declined, and Parr called her a whore, cursed and demanded intercourse. Willars told Parr that she had AIDS, so if he wanted intercourse he needed to go to the office and get a condom. He became enraged and picked her up.

Willars testified that Petitioner then appeared and hit Parr in the back with a three-feet long stick, which shattered. The two men wrestled, and Parr soon fell over because his pants were down. Petitioner put a knife to Parr's throat and told him to stop, and Parr did. Willars described Petitioner as "screaming and wild-eyed and crazy looking, acting like a lunatic." She said that Petitioner bound Parr's hands with duct tape and, later, with bungee cords, then forced Parr into a closet with a rag in his mouth.

As Willars and Petitioner argued, Parr untied himself and burst out of the closet. Parr grabbed a frying pan, and he and Petitioner began fighting over it. Willars said that as she tried to separate them she heard crying and saw Zachary in the bathroom. She told the men to stop because of the child in the room. She testified that Parr then hesitated, and Petitioner grabbed the frying pan and began hitting Parr on the head. Parr would get up after being hit, and Petitioner would hit him again. The men threw each other around the room and tried to choke each other. Petitioner eventually used a luggage strap to choke Parr into submission,

and Parr crumpled to the floor.  Willars could find no pulse but did not want to believe Parr was dead.  Petitioner assured her he was dead and told her to get a grip.

Petitioner put Parr's body back in the closet, and Willars cleaned the room.  She recalled that many items were spattered with blood.  She and Petitioner loaded the contents of their room into Parr's car and left with Zachary.  They drove to a McDonald's where they bought food with money found in Parr's car, and they began driving to the home of Petitioner's friend in Chicago.

Willars testified about letters that Petitioner wrote to her while they were jailed in Bossier before trial.  In the letters, which were introduced in evidence, Petitioner wrote about a possible insanity defense, his desire not to go to a mental institution, and his claim that what happened to Parr was the result of either self-defense or an accident.  Parr wrote:

> [N]o, I don't want to spend years or the rest of my life in a mental hospital. No, I don't want my brain probed and picked apart by people and made a spectacle. And as you know, I don't want to be executed or spend the rest of my life in prison.... What happened in that room was an accident and nothing but an accident.  I just hope these people believe that.... Gail, he was alive when I put him in the closet and we left that motel.  I told you he was dead because I thought you'd want to call an ambulance and have him taken to the hospital and I was in one hell of a state of panic.  And all I wanted to do was get the hell away from there. I didn't think he was going to die. I thought the worse that might happen was that they would put a warrant on us for robbery. I didn't think I hit him that hard. After I told him to leave you alone and asked him to leave and when he refused and when we started to fighting, I kind of lost it there for a minute. That man was strong and all I could think of was that if he beat and hurt me what would he do to you.

The letters included other incriminating statements, as well as Petitioner's encouragement that Willars work with his defense efforts rather than accept a plea bargain. Willars denied on cross-examination that she told Chicago police that Petitioner was armed with the frying pan when he came out of the bathroom and struck Parr in the head.

**E. Zachary Willars** (Tr. 978-1,016)

The 1991 testimony of then 9–year–old Zachary Willars was also read to the jury. Zachary testified that he was living in Chicago, where he had moved after "Mom and James killed a man." He and Petitioner, who had a knife in his hand, were in the bathroom when his mother and Parr entered the motel room and began undressing. The bathroom door was open, and he could see the rest of the room through a mirror. He testified that Petitioner jumped out of the bathroom wielding the knife. His mother picked up a stick and started hitting Parr on the head, while Petitioner put down the knife and watched. Zachary said that Petitioner then taped Parr's mouth and hands and put him in the closet. Parr continued to make noise, so Petitioner took him out of the closet. Gail Willars handed Petitioner a frying pan, he "started hitting [Parr] on the head" with it, and "blood came out on the mirror and blankets." Gail yelled, "Stop, there is a little boy in there," and shut the bathroom door. Zachary testified that he could not see in the room after the door closed, but he heard a sound like "dragging [Parr] to the closet." When Zachary came out of the bathroom a few minutes later, Petitioner opened the closet door, pointed to Parr, and laughed. Zachary said that

Petitioner took Parr's wallet.  The three then packed up and drove Parr's car to Chicago. Zachary testified that Parr never hit his mother or Petitioner.

Petitioner did not testify. The defense rested.  The jury returned a unanimous verdict of guilty as charged of second degree murder.

**Prior Proceedings Were A Nullity**

Petitioner argues that the transcripts from his first trial could not be used at his re-trial because the first trial was null and void ab initio.  His argument misstates the  effect of the federal habeas relief granted. The state court was free to use the transcripts if required procedural safeguards were in place.

Petitioner's argument is rooted in the fact the constitutional violation found to taint his original conviction was structural.  Most errors are considered "trial errors" and are subject to a harmless error analysis.  But some matters are considered "structural errors" or defects that may not be analyzed under a harmless standard.  Examples of structural errors include the complete denial of counsel or adjudication by a biased judge.  Arizona v. Fulminante, 111 S.Ct. 1246, 1265 (1991); Rose v. Clark, 106 S.Ct. 3101, 3105-06 (1986). This limitation recognizes that some errors necessarily render a trial fundamentally unfair.

The Court held in Rose v. Mitchell, 99 S.Ct. 2993 (1979) that discrimination on the basis of race in the selection of members of a grand jury requires the conviction be set aside and the indictment returned by the unconstitutionally constituted grand jury be quashed. The Court recognized the cost associated with that approach but noted that the remedy was less

drastic than where other constitutional rights are violated. In the case of Fourth or Fifth Amendment violations, critical evidence is often suppressed with the result the guilty go free. When a grand jury discrimination is remedied, however, vacating the conviction does not render the defendant immune from prosecution. The defendant may be indicted and tried again in accordance with constitutional requirements. "And in that subsequent prosecution, the State remains free to use all the proof it introduced to obtain the conviction in the first trial." Mitchell, 99 S.Ct. at 3001.

The intermediate state appellate court, during pre-trial writ practice related to whether the death penalty could be imposed in the second prosecution, stated that the 1991 proceeding was nullified or "void ab initio." When the writ proceeded to the Supreme Court of Louisiana, that court denied the application as untimely. In a dissent, Justice Johnson criticized the appellate court's statement that the 1991 trial was void; convictions gained even with the taint of racial discrimination that is a structural defect may stand if the issue is waived by, for example, not filing a timely motion to quash or other challenge.

After he was convicted, Petitioner seized on the void language and presented this claim in a pro se assignment of error on direct appeal. The state appellate court reviewed the proceedings and noted that Petitioner cited no authority for the proposition that the testimony from his first trial must be excluded from the second merely because the initial conviction was vacated due to discrimination in the grand jury process. The court found that a structural defect does not render a case an absolute nullity, as evidenced by the standing murder

conviction of co-defendant Willars, who did not timely raise the grand jury issue.  State v. Crandell, 987 So.2d at 381-82.

To obtain relief on this claim, Petitioner must show that the state court's adjudication of the claim was contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  This refers to holdings of the Supreme Court as of the time of the relevant state court decision.  Yarborough v. Alvarado, 124 S.Ct. 2140, 2147 (2004).  A decision by a federal circuit court, "even if compelling and well-reasoned, cannot satisfy the clearly established federal law requirement under § 2254(d)(1)."  Salazar v. Dretke, 419 F.3d 384, 399 (5th Cir. 2005).

Petitioner has created an argument based on the structural defect doctrine and misstatements of law, or statements made in a different context, by the state appellate court in dicta in a writ denial.  Petitioner has not cited any decisions in which the Supreme Court has held that evidence submitted in a trial may not be used in a subsequent trial if it is determined that the trial was impaired by a structural defect.  Language in Rose v. Mitchell, quoted above, suggests that just the opposite is true.  Petitioner has not demonstrated that he is entitled to relief on this claim.

**Unavailability of Zachary**

The prior testimony of a witness may be admissible, despite the Confrontation Clause, if the witness is unavailable, prosecutorial authorities have made a good-faith effort to obtain

his presence at trial, and other safeguards are met. <u>Crawford v. Washington</u>, 124 S.Ct. 1354 (2004); <u>Barber v. Page</u>. 88 S.Ct. 1318(1968).  Louisiana Code of Evidence Article 804 states that a witness is unavailable in situations including when the proponent of his testimony has been unable to procure his attendance by process or other reasonable means.

Petitioner argued on direct appeal that the State's effort to find Zachary were not adequate.  He continues that argument in his habeas petition.  The state appellate court found that testimony of Amy Noonan established that BPDA made a good-faith and diligent effort to locate Zachary, who appeared to have become a transient with no fixed or permanent address or employment. Despite speaking with relatives and using several online law enforcement tools, the BPDA was not able to find Zachary. The appellate court found no error in the determination that Zachary was unavailable. <u>State v. Crandell</u>, 987 So.2d at 3 83.

Petitioner argues that Zachary's "general whereabouts" were known, with "some assurance," to be the State of California. Petitioner does not offer any more specific information about Zachary's location or what additional efforts BPDA might have taken to locate him and serve him with a subpoena.  Much like the holding of the Illinois Court of Appeals recently reviewed in <u>Hardy v. Cross</u>. 132 S.Ct. 490 (2011), the Louisiana appellate court's holding that the State conducted the requisite good-faith search does not represent an unreasonable application of Supreme Court Confrontation Clause precedents. <u>Hardy</u> noted that it is always possible to think of additional steps that the prosecution might have taken, but the Sixth Amendment does not require exhaustion of every avenue, no matter how

unpromising.  The evidence shows that the BPDA made an extensive search for Zachary, and the state court's rejection of this issue was entirely reasonable.

**Unavailability of Gail Willars**

### A. Ability to Invoke Privilege

Among the issues listed on direct appeal was whether Willars was unavailable because of the possibility she could file a petition for writ of certiorari to the Supreme Court 17 years after her conviction became final.  Tr. 1126.  The argument was somewhat mixed with the contention that Willars waived the privilege by testifying at the first trial and could no longer assert it, but the issue was at least possibly exhausted.  <u>See</u> Tr. 1137-39.  The state appellate court held that the trial judge's acceptance that Willars was pursuing federal habeas relief was not manifestly erroneous on the record and, under the "peculiar circumstances," the trial court did not err in finding Willars to be unavailable.  <u>State v. Crandell</u>, 987 So.2d at 383. Petitioner includes some argument in his habeas brief about whether Willars actually risked incrimination and prosecution, but he bases the argument primarily on a claim of waiver. There is an implied or vague argument, perhaps, that Willars could not exercise the privilege because her conviction was final.

It appears that most courts hold that a convicted person can claim the privilege against self-incrimination as long as a direct appeal is pending or the time for direct appeal has not expired.  <u>See, e.g.</u>, <u>United States v. Duchi</u>, 944 F.2d 391, 394 (8th Cir. 1991).  Courts have held that the mere possibility of a collateral attack is not enough to extend the privilege after

the conviction is final, but it does not appear the Supreme Court has specifically addressed that issue.  See Johnson v. Fabian, 735 N.W.2d 295, 309-10 (Minn. 2007).  Some might, therefore, question the state court allowing Willars to invoke the privilege in this case long after her conviction was final and with only the most fleeting hope of gaining habeas relief on a second or successive petition.  The state courts are free, however, to afford their citizens greater protection against self-incrimination, and perhaps such a rule was applied in this case. In any event, the state court's allowing the exercise of the privilege did not violate clearly established Supreme Court precedent, so no habeas relief is available on this claim (to the extent it was properly exhausted and presented).

### B. Waiver of Privilege

Petitioner argues, citing Rogers v. United States, 71 S.Ct. 438 (1951), that Willars waived her right against self-incrimination when she took the stand at the first trial so could not invoke the privilege at the second trial.  Rogers did hold that once a witness elects to testify and provide incriminating facts, he cannot invoke the privilege to avoid disclosure of the details of what has been disclosed. The Court has also stated, citing Rogers, that: "It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." Mitchell v. U.S., 119 S.Ct. 1307, 1311-12 (1999).  The privilege is waived for the matters to which the witness testifies, and the scope of the waiver is determined by the scope of relevant cross examination.  Id., citing Brown v. United States, 78 S.Ct. 622 (1958).

Willars took the stand at the first trial and voluntarily testified on direct examination as part of the defense case. She was subjected to cross examination by the prosecutor and other defense counsel. That trial is over. Willars did not attempt at the second trial to provide some testimony but avoid cross-examination. Rather, she chose not to testify at all. The state court did not find a waiver in those circumstances, and its decision did not run afoul of any clearly established Supreme Court precedent.

Petitioner's appellate challenge to Willars' testimony included an argument that the court should not have accepted a blanket assertion of the privilege. Rather, Willars should have been required to take the stand and assert the privilege on a question by question basis. The state courts did not directly address this argument, which is not surprising given the less than clear fashion in which the arguments were presented. Petitioner cites a Sixth Circuit opinion that says the rule in that circuit is that a person invoking the privilege must answer individualized questions to invoke the privilege. But even that decision recognizes that when a person has a clear entitlement to claim the privilege, forcing them to take the stand is futile and unnecessary. And that is what the Court held with respect to the witness at issue. U.S. v. Bates, 552 F.3d 472, 475-76 (6th Cir. 2009).

A trial court should inquire into the legitimacy and scope of the privilege to assess the boundaries of the privilege in relation to the testimony sought. But a witness may be totally excused if the court determines that she could legitimately refuse to answer essentially all relevant questions. U.S. v. Mares, 402 F.3d 511, 514 (5th Cir. 2005). The Fifth Circuit has

considered, in determining whether a trial court abused its discretion on such an issue, whether the defendant has indicated what material and relevant testimony was excluded. U.S. v. Ibarra, 291 Fed. Appx. 611 (5th Cir. 2008).

The trial judge asked Willars if she would invoke the privilege with respect to any questions about the day of the murder, and she said she would.  The court did not require Willars to take the stand and assert the privilege on a question by question basis, and defense counsel did not articulate any questions that might help Petitioner's defense that would fall outside the privilege.  Petitioner has had many years in which to think of such questions, but he has not articulated any to date.  Petitioner has not demonstrated that his conviction should be vacated based on this argument.

### C. Similar Motive

The Confrontation Clause provides that the accused shall enjoy the right to be confronted with the witnesses against him.  The Supreme Court explained in Crawford v. Washington, 124 S.Ct. 1354 (2004) that this right bars the introduction of testimonial statements, including testimony from a prior proceeding, of a witness who does not appear at trial unless the witness is unavailable to testify and the defendant had "a prior opportunity for cross examination."

Louisiana Code of Evidence Art. 804(B)(1) provides that testimony given as a witness at another hearing may be offered if the party against whom it is offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination ... ."

Petitioner argued on direct appeal that the similar motive element of Article 804 was not met. Tr. 1142-44. The state appellate court wrote that Willars testified as part of the defense case, and 67 of the 181 pages of her testimony was examination by Petitioner's attorney. The court found that Petitioner had every full and fair opportunity and a similar motive to thoroughly question Willars and develop her testimony at the original trial. State v. Crandell, 987 So.2d at 383-84.

Petitioner, in his federal habeas petition, does not make a broad attack on the satisfaction of Article 804(B)(1), but he does argue that one aspect of Willars' testimony does not satisfy the Louisiana evidence rule. He singles out Willars' testimony about statements she gave to Chicago police. He adds that the State could not have introduced evidence of those statements in its case at the second trial; they were only admitted because Willars testified about them as part of the defense case at the first trial. The basis of the argument is not well explained, but there is no basis for federal habeas relief based on a mere error in the application of state evidence rules. Only federal constitutional errors that satisfy the demands of 28 U.S.C. § 2254 allow habeas relief.

The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475

(1991).  The evidence must have had a substantial and injurious effect or influence in determining the jury's verdict.  Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

Willars' testimony about the statements to the Chicago police was mainly that she did not remember what she said and that she had been very intoxicated at the time.  Petitioner's appellate arguments on this issue rested on state law and did not specifically invoke the Due Process Clause.  Even if it is assumed a federal claim related to this issue had been exhausted, the state court's resolution of the evidentiary issue was reasonable, and the challenged evidence was not of great significance.  There was more than ample other evidence that Petitioner murdered Mr. Parr.

**Other Crimes Evidence**

The testimony read to the jury at the most recent trial included Willars' discussion of heavy use of cocaine by Petitioner and Willars, their arrests and convictions for drug crimes, and that Petitioner was in violation of his parole at the time of the murder.  Petitioner argued on direct appeal that the transcripts should have been redacted to exclude this information.

Such other crimes evidence is admissible under state law if relevant to motive or other specified factors.  The state appellate court found that the motive for the murder, as described by Willars, was for the couple to obtain rent money, not to buy cocaine.  It thus concluded that the evidence of the cocaine binge in the preceding year had no relevance and should have been excluded.  The court then examined whether the error was harmless and determined that the admission of the evidence was "hardly so damning as to have affected

the verdict." The jury heard that neither Petitioner nor Willars was under the influence of drugs at the time of the crime, and there was overwhelming evidence that Petitioner intended to kill Parr to steal his property. State v. Crandell, 987 So.2d at 385-86.

Petitioner's argument to the state courts on this issue was that the admission of the other crimes evidence violated the Louisiana Code of Criminal Procedure and Louisiana Code of Evidence Articles 402 and 404. As noted above, federal courts do not grant habeas relief based on mere errors in the application of state evidentiary rules. Petitioner did not properly exhaust a federal claim related to this argument, so habeas relief is not available.

**Improper References**

Petitioner also argued on direct appeal that the transcripts read to the jury included improper references to the fact that the original charge was first degree murder and that the testimony was given before a jury (which purportedly left the impression that Petitioner was previously convicted). Petitioner also complained that Willars' testimony included references to the testimony of two witnesses who testified at the 1991 trial but did not testify at the 2007 trial. Petitioner did not complain that there were any improper statements attributed to those witnesses. He complained only that they left the impression the other witnesses had testified at the earlier trial so left it open for the jury to speculate what role they may have played.

The state appellate court ruled that the trial court should have made a greater effort to excise such unnecessary references from the prior testimony before allowing it to be

presented to the jury.  The references were, however, vague and did not reflect that Petitioner had previously been convicted of first degree murder.  Any error in this respect was deemed harmless.  State v. Crandell, 987 So.2d at 386.

Habeas relief is not available with respect to these arguments for the same reasons given above.  Petitioner presented these claims to the state court as state evidentiary law violations, for which habeas relief is not available.  Federal habeas applicants must claim violation of a federal constitutional right.  Estelle v. McGuire, 112 S.Ct. 475, 479-80 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.")

**Cumulative Error**

Petitioner's final argument is that the several evidentiary violations and other improprieties in his case cumulatively deprived him of a fair trial so that his murder conviction should be vacated.  Federal habeas corpus relief may only be granted for cumulative errors  in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process.  Martinez Perez v. Dretke, 172 Fed. Appx. 76 (5th Cir. 2006), citing  Derden v. McNeel, 978 F.2d 1453, 1457 (5th Cir.1992) (en banc).  Most of the errors cited by Petitioner are, at most, mere violations of state law.  He has not demonstrated errors that would meet the demanding standard established in Derden.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the

applicant.  A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2).  A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of July, 2013.


MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE